**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| | * | |
| ANDREA PETERSON, | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil No. 22-1759-BAH |
| CAPITAL ONE, N.A., | * | |
| Defendant. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**<u>MEMORANDUM OPINION</u>**

Plaintiff Andrea Peterson ("Plaintiff") filed suit against her former employer, Defendant Capital One, N.A. ("Defendant"), alleging multiple violations of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA"). ECF 14. Specifically, Plaintiff alleges that Defendant violated the ADA by (1) discriminating against her on the basis of her disability; (2) retaliating against her after she complained of that discrimination; (3) creating a hostile work environment by subjecting Plaintiff to repeated harassment based on her disability; and (4) failing to accommodate Plaintiff's disability. *Id.* at 9–10, ¶¶ 67–78.

Before the Court is Defendant's motion for summary judgment, ECF 25. The motion for summary judgment included a memorandum of law and exhibits.[1] The Court has reviewed all relevant filings, including Plaintiff's opposition, ECF 28, and Defendant's reply, ECF 33, and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). Accordingly, for the reasons stated below, Defendant's motion for summary judgment is **GRANTED in part** and **DENIED in part**.

---

[1] The Court references all filings by their respective ECF numbers.

Summary judgment is **GRANTED** for Defendant on counts one, two, and four, and **DENIED** on count three.

I.   <u>**BACKGROUND**</u>

In 2007, Plaintiff began working as a Relationship Banker[2] at Chevy Chase Bank.  ECF 25-3, at 7; ECF 29, at 24.  When Defendant acquired Chevy Chase Bank in 2010, Plaintiff continued in her position and became an employee of Defendant.  ECF 25-3, at 7; ECF 29, at 24. Plaintiff remained employed by Defendant until 2019.  ECF 29, at 4; ECF 25-5, at 3.

Prior to the events that gave rise to this case, from 2013 through the first part of 2015, Plaintiff was supervised by Frank Monyeh, the former branch manager of Defendant's Wheaton branch, where Plaintiff worked.  ECF 25-3, at 8–10; ECF 29, at 26–28.  During that time, Mr. Monyeh placed Plaintiff on a coaching plan, citing several mistakes Plaintiff made in opening accounts.  ECF 25-3, at 9; ECF 29, at 27.  In August 2015, Sofia Alhalaseh took over as the Wheaton branch manager and became Plaintiff's supervisor.[3]  ECF 25-3, at 10; ECF 29, at 28.

In January 2016, Plaintiff was diagnosed with a seizure disorder.[4]  ECF 29, at 37.  Plaintiff informed her supervisor at the time, Ms. Alhalaseh, of her diagnosis.  ECF 25-3, at 20; ECF 29, at 40.  It is undisputed that Plaintiff discussed her epilepsy with Ms. Alhalaseh, but the content of these conversations is contested.  *See* ECF 25-2, at 14 n.3; ECF 28, at 3–4.  Plaintiff alleges that Ms. Alhalaseh made repeated insulting remarks about her condition and pressured her to step down

---

[2] According to Plaintiff, a Relationship Banker's duties are customer service and sales, including "[o]pening accounts, opening credit cards, applying for mortgages and lines of credit for customers, changing addresses, [and performing] any kind of maintenance to a customer's account."  ECF 29, at 25.

[3] Mr. Monyeh was allegedly terminated due to multiple allegations of workplace misconduct raised against him by subordinates, including Plaintiff.  ECF 25-3, at 10; ECF 29, at 28.

[4] Plaintiff appears to use the terms "seizure disorder" and "epilepsy" interchangeably.  ECF 29, at 39.

from her position.  ECF 28, at 3–4.  According to Plaintiff, Ms. Alhalaseh made comments to her at weekly meetings, monthly meetings, meetings for evaluations, and after every doctor's appointment for which she took off work during the first half of 2016, telling her to resign or "self-demote," claiming that such action "would be the best thing," and asking her whether or not she had decided to resign yet.   ECF 25-3, at 27; ECF 29, at 56; ECF 28, at 19–20.  After Plaintiff misplaced a set of keys, she claims that Ms. Alhalaseh told her, "[Y]ou're not focusing.  This is because you have seizure disorder.  And we can't—you know, we can't look after you."  ECF 25-3, at 27; ECF 29, at 56.  Plaintiff further claims that Ms. Alhalaseh told her that she was "not going to be able to have children" if she insisted upon continuing to work with her disability.  ECF 25-3, at 27; ECF 29, at 56.  On one occasion, Ms. Alhalaseh called Plaintiff's time off to manage her disability "truly difficult" for Ms. Alhalaseh and told Plaintiff she "need[ed] to figure out what [she was] going to do."  ECF 29, at 177.  On another, after Plaintiff told Ms. Alhalaseh that she had been having seizures the night before and needed a few hours of FMLA time in the morning to recover, Ms. Alhalaseh texted Plaintiff, "u still [need] to perform at ur job even [i]f u have fmla." ECF 29, at 178 (spelling and capitalization in original).  When Plaintiff's husband called Ms. Alhalaseh to inform her that Plaintiff was ill and would not be able to come to work, Plaintiff alleges that Ms. Alhalaseh "scream[ed]" at her husband over the phone, saying that Plaintiff "need[ed] to decide between her job and her health."  ECF 29, at 111.  Defendant counters that Ms. Alhalaseh vehemently denies that she ever said anything inappropriate regarding Plaintiff's condition.  ECF 25-2, at 14 n.3.

After Plaintiff's diagnosis, Defendant granted Plaintiff's request for intermittent leave under the Family Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA"), which Plaintiff used in 2016 and 2017 as needed for her seizure disorder.  ECF 25-3, at 19; ECF 29, at 39.  Plaintiff

alleges that Ms. Alhalaseh berated her about using her approved FMLA leave and continued to pressure her to resign due to her seizure disorder. ECF 28, at 4–7. Defendant asserts that Ms. Alhalaseh "vehemently denies ever making such comments." ECF 25-2, at 27 n.5.

In August 2016, Plaintiff contacted Defendant's Human Resources department to complain about the alleged discriminatory treatment from Ms. Alhalaseh. ECF 29, at 118–22. Human Resources began an investigation into the allegations and contacted Ms. Alhalaseh regarding the complaint. *Id.*

In the latter part of 2016, after her conversations with Human Resources, Plaintiff requested, and Defendant granted, several workplace accommodations, including allowing Plaintiff to wear tinted glasses during the workday, permitting Plaintiff to take an extra break during the day, providing Plaintiff with access to a place to rest during the day, and reducing Plaintiff's hours to 36 hours per week instead of 40. ECF 25-3, at 20–22; ECF 29, at 40–42.

During this period, Plaintiff alleges that Ms. Alhalaseh continued to harass Plaintiff about using her approved FMLA leave and continued to pressure her to resign or step down. ECF 28, at 4–7. Plaintiff received a "documented verbal coaching" and several reprimands from Ms. Alhalaseh during this time. ECF 25-3, at 39. In late 2016, Plaintiff sent several messages to Human Resources outlining the alleged discriminatory and retaliatory acts committed by Ms. Alhalaseh, including the "documented verbal coaching." ECF 29, at 160, 163, 166–69, 172–196. Plaintiff also filed a charge of discrimination against Defendant with the Human Rights Commission of Montgomery County, Maryland.[5] ECF 29, at 218–19. On November 17, 2016, Plaintiff informed Human Resources that she had retained counsel to represent her regarding her

---

[5] The parties dispute the findings of the Human Rights Commission. *See* ECF 25-2, at 14 (stating that the Commission found no discrimination); ECF 28, at 12 (admitting that Plaintiff filed a complaint with the Commission, but "disput[ing] the findings").

retaliation and disability discrimination concerns.  *Id.* at 196.  Plaintiff also requested she no longer be supervised by Ms. Alhalaseh.  *Id.* at 190.

On November 30, 2016, Human Resources notified Plaintiff that they had completed their investigation into her complaint against Ms. Alhalaseh and found no evidence of discrimination or harassment.  *Id.* at 198.  Also on that day, Defendant issued Plaintiff a "conduct memo" outlining recent performance deficiencies in her work and placed Plaintiff on a "performance improvement plan."  ECF 25-3, at 42–44, 45–47.  At the end of the year, when Ms. Alhalaseh completed Plaintiff's 2016 Performance Review, her overall rating of Plaintiff was "Action Required," the lowest possible score.  ECF 25-3, at 48; ECF 25-5, at 40.

On December 16, 2016, Plaintiff went on short-term disability leave as her seizures grew more frequent and severe.  ECF 29, at 44–45, 49.  She was hospitalized from December 22, 2016, until March 15, 2017.  ECF 25-3, at 13; ECF 29, at 31.  Plaintiff alleges that the stress she felt from the discrimination she experienced at work exacerbated her health problems.  ECF 29, at 44–45.  When Plaintiff returned to work, she requested a transfer, and in May 2017, Defendant transferred her to a Washington, D.C., branch.  ECF 25-3, at 14; ECF 29, at 32.

From the time Plaintiff started working at the Washington, D.C., branch in May 2017 through June 2018, Plaintiff's supervisor was Florence Lopez.  ECF 25-3, at 14; ECF 29, at 32.  Ms. Lopez reinstituted Ms. Alhalaseh's performance improvement plan for Plaintiff in May 2017.  ECF 25-3, at 16; ECF 29, at 34.  Plaintiff was removed from the plan in July 2017.  ECF 25-3, at 16; ECF 29, at 34.

In 2018, Adebayo Adebambo became the branch manager of the Washington, D.C., branch where Plaintiff worked and became Plaintiff's new manager.  ECF 25-5, at 2.  In July 2018, one of the other employees at the branch regularly played music from a speaker near the other

employee's desk.  ECF 25-5, at 2.  Plaintiff requested an accommodation from Human Resources permitting her to wear headphones to block out the noise from the speaker or to have the volume of the music lowered.  *Id.* at 5.  Human Resources granted Plaintiff an accommodation to have the music turned off, and Mr. Adebambo instructed the other employee to turn off the music permanently.  *Id.* at 2, 27.

In May 2019, Defendant installed a new branch-wide music system that piped music to all parts of Plaintiff's branch, including Plaintiff's workspace.  ECF 25-5, at 2.  Plaintiff contacted Human Resources and requested that the music be turned off, citing her accommodation from the previous year.  *Id.* at 8.  Human Resources informed Plaintiff that because the new, company-sanctioned set-up differed substantially from the prior situation where a colleague had been playing his own music through a speaker, she would need to submit a request for a new accommodation.  *Id.*  Human Resources communicated to Plaintiff that the music played could be exclusively instrumental and played at a "conversational" volume.  *Id.*  At one point, Mr. Adebambo turned the music off at Plaintiff's request, but Human Resources told him to turn the music back on because company policy was to have music playing through the piped system, and there was no formal accommodation in place that required otherwise.  *Id.* at 30–31.  There is no evidence that Plaintiff submitted a new accommodation request related to the piped-in music system.  *See id.* at 37.

In July 2019, during Plaintiff's mid-year check-in, Mr. Adebambo rated her as "below strong" and cited several instances of accounts that were improperly opened by Plaintiff.  ECF 25-3, at 57–59.  Mr. Adebambo placed Plaintiff on a coaching plan in August 2019.  ECF 25-3, at 58-59.  In placing Plaintiff on this plan, Mr. Adebambo again cited to several specific instances of misconduct by Plaintiff, including cancelling the wrong customer's debit card and failing to follow

proper procedures for verifying customer information while opening accounts, resulting in the opening of a business account for a customer who presented fraudulent documents, exposing the bank to a loss of more than $60,000.  ECF 25-3, at 58; ECF 25-5, at 3, 43–76.  After Mr. Adebambo placed Plaintiff on this coaching plan, Plaintiff filed a complaint with Human Resources alleging discrimination by Mr. Adebambo, but Human Resources upheld Mr. Adebambo's actions and the coaching plan after an investigation.  ECF 25-3, at 31; ECF 29, at 60.  Defendant terminated Plaintiff's employment on October 11, 2019.  ECF 25-5, at 3.  Following her termination, Plaintiff filed a complaint alleging retaliation with the Washington, D.C., Office of Human Rights in November 2019.  ECF 25-3, at 31; ECF 29, at 60.

## II.  <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'"  *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)).  "A fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Anderson*, 477 U.S. at 247–48 (emphasis in original).  The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.  *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007).  This includes "questions of credibility and of the weight to be accorded to particular evidence."  *Masson v. New Yorker Mag.*, 501 U.S.

496, 520 (1991) (citing *Anderson*, 477 U.S. at 255). "[I]n the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility." *Angelini v. Balt. Police Dep't*, 464 F. Supp. 3d 756, 776 (D. Md. 2020).

At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)). "[U]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *see also CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658–59 (4th Cir. 2020); *Williams v. Giant Food Inc.*, 370 F.3d 423, 433 (4th Cir. 2004) ("[The nonmoving party's] self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment."); *Harris v. Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir. 2012) ("Although we do not make credibility determinations at the summary judgment phase, we should also not find a genuine dispute of material fact based solely on [the plaintiff's] self-serving testimony."). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat*, 346 F.3d at 522 (quoting the pre-2007 version of Fed. R. Civ. P. 56(e)).

## III.   <u>ANALYSIS</u>

The ADA prohibits employers from discriminating against otherwise "qualified individual[s] on the basis of disability." 42 U.S.C. § 12112(a)–(b). Among the forms of discrimination prohibited by the statute are (1) imposing an adverse action upon an employee due to their disability; (2) retaliating against an employee for engaging in protected activities related

to disability discrimination; (3) creating a hostile work environment; and (4) failing to reasonably accommodate an employee with a disability.  *See Israelitt v. Enter. Servs. LLC*, 78 F.4th 647, 653 (4th Cir. 2023) (recognizing each type of claim under the ADA).  Plaintiff alleges that Defendant engaged in all of the above forms of discrimination.  ECF 14, at 9–10, ¶¶ 67–78.

In addition to their unique elements, Plaintiff's claims of discrimination, hostile work environment, and failure to accommodate share common elements requiring Plaintiff to show that she (1) has a disability and (2) is otherwise qualified for the employment in question.[6]  *See Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 572 (4th Cir. 2015) (requiring both elements for discrimination claim); *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013) (requiring both elements for failure to accommodate claim); *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 177 (4th Cir. 2001) (requiring both elements for hostile work environment claim).  In this case, Plaintiff has provided evidence to support both of these elements, and Defendant does not dispute that Plaintiff has satisfied these elements.  *See* ECF 31-1, at 4–8 (FMLA certification completed by Plaintiff and her doctor describing seizure disorder); ECF 29, at 75–79, 90–94 (showing positive performance review and company awards received by Plaintiff in years prior to Plaintiff's diagnosis); ECF 29, at 34 (explaining that Plaintiff successfully met requirements of 2017 performance improvement plan and was given additional responsibilities in 2018); *see also* ECFs 25-2, 33 (raising no question related to either element in Defendant's motion for summary judgment or in Defendant's reply).  Thus, to survive Defendant's motion for summary judgment,

---

[6] Under the ADA, a "disability" is defined as "a physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A).  A "qualified individual" is one who, "with or without reasonable accommodation, can perform the essential functions of the employment position that [the] individual holds or desires."  *Id.* § 12111(8).

Plaintiff must show a dispute of material fact regarding any of the other, unique elements of her claims.

"When a plaintiff alleges that her employer unlawfully discriminated or retaliated against her in violation of the ADA, she can prove her claim through direct and indirect evidence. Otherwise, the plaintiff may proceed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)." *Laird v. Fairfax Cnty.*, 978 F.3d 887, 892 (4th Cir. 2020) (citing *Jacobs*, 780 F.3d at 572, 577). Under the *McDonnell Douglas* framework, the plaintiff first bears the burden to establish a prima facie case for their claim. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49–50 (2003). After the plaintiff establishes their prima facie case, the burden shifts to the defendant to rebut the inference of unlawful conduct by showing that there was a legitimate, non-discriminatory purpose for their actions. *Id.* The plaintiff, however, can still succeed on their claim if they are able to prove that the defendant's allegedly legitimate purpose is pretextual. *Jacobs*, 780 F.3d at 575–76 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

### A.    Count One: Discrimination

To establish discrimination under the ADA, Plaintiff "must prove that: (1) she is disabled; (2) she was a qualified individual; and (3) she suffered an adverse employment action based on her disability." *Laird*, 978 F.3d at 892, n.4 (citing *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005)). Because there is no dispute here that Plaintiff is disabled and that she was a qualified individual prior to her termination, the motion for summary judgment on this claim turns on whether or not Plaintiff suffered an adverse employment action on the basis of her disability.

An adverse employment action is one that adversely "affect[ed] employment or alter[ed] the conditions of the workplace." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006).  Termination is an adverse employment action.  42 U.S.C. § 12112(a) (prohibiting discrimination on the basis of disability in certain employment actions, including the "discharge" of employees); *see also Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (citing "firing" as an example of an adverse action).  Simply receiving a negative performance evaluation or being placed on a performance improvement plan, however, is not an adverse action.  *See Pulley v. KPMG Consulting, Inc.*, 348 F. Supp. 2d 388, 395 (D. Md. 2004), *aff'd*, 183 F. App'x 387 (4th Cir. 2006) ("A performance review which has no effect on Plaintiff's compensation or promotion cannot be considered an adverse employment action.  Similarly, placement in a [performance improvement plan] 'simply does not amount to a redressable adverse employment action.'" (quoting *Jeffers v. Thompson,* 264 F. Supp. 2d 314, 329 (D. Md. 2003))).  But though placement on a performance improvement plan alone does not constitute an adverse employment action, "placement on the improvement plan may be 'actionable' if 'the employer subsequently use[d] the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment.'" *Enoch v. Becton, Dickinson & Co.*, Civ. No. ELH-11-3551, 2012 WL 2371049, at *10 (D. Md. June 22, 2012) (quoting *James v. Booz–Allen & Hamilton, Inc.,* 368 F.3d 371, 377 (4th Cir. 2004)). Thus, if the placement of Plaintiff on a performance improvement plan ultimately was used as the basis for her termination, it may be considered as part of the adverse employment action.

The Court first considers Plaintiff's alleged direct evidence of discrimination.  Direct evidence of discrimination is "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Bandy v. City of Salem*, 59 F.4th 705, 711 (4th Cir. 2023) (citation omitted).  Isolated

discriminatory statements outside of the context of the adverse employment action alone are not sufficient direct evidence to demonstrate discrimination. *See Betof v. Suburban Hosp., Inc.,* Civ. No. DKC 11-1452, 2012 WL 2564781, at *7 (D. Md. June 29, 2012) (comments made by supervisor about "racial issues" in a "context separate" from plaintiff's termination did not provide direct evidence of discrimination).

Plaintiff claims that her supervisor Ms. Alhalaseh's repeated statements that Plaintiff should resign due to her disability and suggestions that she could not perform her job due to her disability constitute direct evidence of discrimination.[7] ECF 28, at 14. These statements from Ms. Alhalaseh rise beyond the level of isolated statements unrelated to Plaintiff's employment status. According to Plaintiff, and supported by her repeated contemporaneous reports to Human Resources, Ms. Alhalaseh told Plaintiff multiple times that she should resign or reduce her hours specifically because she was incapable of performing her job due to her disability. ECF 29, at 3–6, 166–69, 172–196. If actually stated, these comments, on their face, support Plaintiff's claim that Ms. Alhalaseh believed that Plaintiff was less capable because of her disability and that Ms. Alhalaseh did not want Plaintiff to continue in her role because of her disability. This clearly indicates a "discriminatory attitude" towards Plaintiff's disability.

Furthermore, Ms. Alhalaseh issued a "Documented Verbal Coaching," the first step to putting Plaintiff on a performance improvement plan, less than one week after complaining via email that she was "fed up" with Plaintiff's use of approved FMLA leave and expressing that "something else should be done to have her go to another office." ECF 29, at 144; *see also* ECF 31-1, at 9–10 (approving Plaintiff's initial application for intermittent FMLA leave and explaining

---

[7] Though Defendant disputes that Ms. Alhalaseh made these statements, ECF 25-2, at 14 n.3, 27 n.5, the Court resolves all factual issues in favor of the non-moving party, here Plaintiff, in considering a motion for summary judgment. *Laird*, 978 F.3d at 892.

that she was able to use it as needed by providing notice to her supervisor); ECF 29, at 192 (email from Human Resources staff in November 2016 reflecting that Plaintiff was approved for FMLA at that time);  ECF 25, at 6 (Defendant acknowledging that Plaintiff was approved for intermittent FMLA use); ECF 29, at 192 (Ms. Alhalaseh acknowledging that Plaintiff was approved for intermittent FMLA use).  Given the content of Ms. Alhalaseh's statements and the close temporal link between the statements and the initiation of disciplinary action, the link between Ms. Alhalaseh's displeasure with Plaintiff's disability and accommodations and her implementation of disciplinary procedures against Plaintiff can be readily inferred.  *See Bandy*, 59 F.4th at 711 (holding that temporal proximity between discriminatory comments and adverse employment actions can support an inference of discriminatory intent in the context of age discrimination).

Defendant claims that, even if Ms. Alhalaseh did make such comments, the comments cannot constitute direct evidence of discrimination because "Ms. Alhalaseh had no involvement" with Plaintiff's termination.  ECF 25-2, at 17.  Defendant fails to acknowledge, however, that this circuit's precedent clearly establishes that discriminatory acts by a plaintiff's previous supervisor can still give rise to liability for an employer when those discriminatory acts are later used by a separate party as the basis for termination of the plaintiff.  *See Smyth-Riding v. Scis. & Eng'g Servs., LLC*, 699 F. App'x 146, 155 (4th Cir. 2017) ("[I]f a supervisor performs an act motivated by [unlawful] animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable' [under the ADA]." (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011))).

Plaintiff alleges the performance improvement plan on which Ms. Alhalaseh placed her in November 2016, an apparent escalation of the "Documented Verbal Coaching" issued to Plaintiff in September 2016, contributed to the ultimate decision to terminate Plaintiff in 2019.  ECF 28, at

16.   Plaintiff specifically points to a Human Resources staff member referencing the 2016 performance improvement plan in an email to other Human Resources staff shortly before Plaintiff's termination.  *Id.* at 14–15.  Resolving all facts in the light most favorable to Plaintiff, Ms. Alhalaseh's comments combined with her placement of Plaintiff on the performance improvement plan that was referenced by Human Resources staff immediately before making the decision to terminate Plaintiff gives rise to a genuine dispute of material fact as to whether discriminatory intent contributed to Defendant's decision to terminate Plaintiff's employment.

This does not end the Court's analysis, however.  That there is a dispute as to whether there was a discriminatory reason that Defendant decided to terminate Plaintiff does not suffice to defeat summary judgment on a discrimination claim under the ADA; the discriminatory reason must be "more than *a* motivating factor: it must be *the only* motivating factor."  *Davis v. W. Carolina Univ.*, 695 F. App'x 686, 688 (4th Cir. 2017) (emphasis in original) (citing *Gentry v. E. W. Partners Club Mgmt. Co.*, 816 F.3d 228, 235 (4th Cir. 2016)).  "If an employer acts with a mixed motive—both a discriminatory and non-discriminatory reason—then the employer is not liable."  *Id.*

Despite Plaintiff's claim that she "has established evidence to dispute the fact that she was failing to meet job expectations," ECF 28, at 17, the documentary evidence clearly shows that *all* of Plaintiff's managers between 2013 and 2019 found such serious deficiencies in her performance that they initiated some form of rehabilitative or disciplinary action.  ECF 25-3, at 32–37, 39, 42–59.  Plaintiff was placed on a coaching plan or performance improvement plan by Mr. Monyeh in 2015, by Ms. Alhalaseh in 2016, by Ms. Lopez in 2017, and Mr. Adebambo in 2019.  *Id.* at 32–37, 39, 42–59.  Though Plaintiff alleges the discriminatory conduct began in 2016, her overall performance rating for 2015, before she was even diagnosed with her disability, rated her as "inconsistent," the second lowest score possible.  *Id.* at 35–36; ECF 25-5, at 40.

Documentation from sources other than Plaintiff's supervisors also reflects serious mistakes committed by Plaintiff throughout her time as an employee of Defendant, such as losing customers through failing to communicate, ECF 25-3, at 38; failing to complete sufficient documentation on accounts, *id.* at 40; and failing to follow proper procedure for account creation, resulting in the opening of a business account for a customer presenting fraudulent documents, ECF 25-5, at 55–59.  Defendant offers all of these reasons, as well as other instances of on-the-job errors committed by Plaintiff, as legitimate, non-discriminatory motivation for Plaintiff's termination.  ECF 25-2, at 18–20.  The decision to terminate an employee who makes such errors "is the kind of business decision that [the Court is] reluctant to second-guess." *Rowe v. Marley Co.*, 233 F.3d 825, 831 (4th Cir. 2000).  Even viewed in the light most favorable to Plaintiff, the undisputed evidence demonstrates that Defendant had legitimate, non-discriminatory reasons for terminating Plaintiff.  As such, Plaintiff is not able to defeat Defendant's motion for summary judgment on this count with direct evidence.

Plaintiff is similarly unable to defeat Defendant's motion for summary judgment on this count through employing the *McDonnell Douglas* burden-shifting framework.  Because the adverse employment action Plaintiff suffered was her termination, Plaintiff's discrimination claim is effectively a claim for wrongful discharge.  To establish a prima facie case of wrongful discharge, a plaintiff must show that "(1) [s]he is within the ADA's protected class; (2) [s]he was discharged; (3) at the time of [her] discharge, [s]he was performing the job at a level that met [her] employer's legitimate expectations; and (4) [her] discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Haulbrook v. Michelin N. Am., Inc.,* 252 F.3d 696, 702 (4th Cir. 2001) (citing *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio*, 53 F.3d 55, 58 (4th Cir. 1995)).  Plaintiff is disabled, and there is no dispute that her employment with Defendant

was terminated.  However, for the reasons described above, Defendant has presented sufficient evidence to establish that Plaintiff was not performing her job at a level that met Defendant's legitimate expectations.  As such, Plaintiff cannot establish a prima facie case for discrimination and fails to point to a genuine dispute of material fact.

Because Plaintiff fails to identify a genuine dispute of material fact through either the presentation of direct evidence or through employing the *McDonnell Douglas* burden-shifting framework, Defendant's motion for summary judgment as to count one is **GRANTED**.

### B.    Count Two: Retaliation

To succeed on a retaliation claim brought under the ADA, a plaintiff must show: "(1) she has engaged in protected conduct; (2) she suffered an adverse action after engaging in the protected conduct; and (3) there was a causal link between the protected conduct and the adverse action." *Laird*, 978 F.3d at 892 n.4 (quoting *Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006)).  Plaintiff here engaged in protected conduct when she requested accommodations, reported her concerns about discrimination based on her disability to Human Resources, and filed a complaint with the Montgomery County Human Rights Commission.  ECF 28, at 8, 21; *Jacobs*, 780 F.3d at 577 (requesting accommodation is a protected activity); *Staley v. Gruenberg*, 575 F. App'x 153, 154 (4th Cir. 2014) (per curiam) (filing internal grievance is a protected activity); *Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 850 (9th Cir. 2004) ("Pursuing one's rights under the ADA constitutes a protected activity.").  Defendant does not dispute this.  *See* ECF 25, at 30–32; ECF 33, at 12–13.  As addressed above, Plaintiff suffered an adverse action when she was terminated from her position with Defendant, and the performance improvement plans and negative reviews she received are actionable to the extent that they were relied upon in making the decision to

terminate her.[8]  The key question, then, is whether Plaintiff is able to show that there was a causal link between her protected conduct and her termination.

Plaintiffs commonly point to a temporal connection to support an inference of a causal link between their protected activity and an adverse action, with shorter time periods giving rise to a stronger inference.  *See Wilson v. City of Gaithersburg*, 121 F. Supp. 3d 478, 485–86 (D. Md. 2015) (citing *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001)) (collecting cases about temporal relationship between protected activity and adverse action and finding that a gap of three months between the activity and the adverse action was too long a period to support a causal inference).  The Fourth Circuit has held that "a lapse of two months between the protected activity and the adverse action is 'sufficiently long so as to weaken significantly the inference of causation.'"  *Horne v. Reznick Fedder & Silverman,* 154 F. App'x 361, 364 (4th Cir. 2005) (quoting *King v. Rumsfeld,* 328 F.3d 145, 151 n.5 (4th Cir. 2003)).

Plaintiff engaged in multiple instances of protected activity over the course of a three-year period.  *See* ECF 28, at 21.  There was at least one instance when Plaintiff engaged in protected activity and was met with an adverse event in less than two months: Plaintiff filed a complaint of discrimination against Mr. Adebambo on August 15, 2019, soon after she was placed on a coaching

---

[8]  The scope of what qualifies as an adverse action differs slightly between the contexts of discrimination and retaliation, but the result here is the same under both frameworks.  *See Laird*, 978 F.3d at 893 ("For a discrimination claim, the plaintiff must show that her employer took an action that adversely affected *employment* or altered the conditions of the *workplace*.  But for a retaliation claim, the plaintiff is not so limited since the scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." (internal citations omitted)); *see also Hamilton v. Prince George's Cnty.*, Civ. No. DKC-17-2300, 2019 WL 4735429, at *4–5 (D. Md. Sept. 27, 2019) ("In the retaliation context, the plaintiff must show merely that the challenged action well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. . . . A poor performance review or reprimand does not constitute an adverse action unless it causes real harm to the plaintiff's employment or is an intermediate step to discharge.").

plan, and she was terminated on October 11, 2019.  ECF 25-3, at 31; ECF 29, at 341–42.  Though there was a nearly two-month period between these events, there is evidence that Human Resources staff began discussing Plaintiff's termination weeks earlier, in September.  *See* ECF 29, at 339 (email from Human Resources staff on September 29, 2019, noting increasing concerns with Plaintiff and calling to "regroup ASAP next week" regarding Plaintiff).  Drawing all inferences in favor of Plaintiff, the rapidity with which employment consequences befell Plaintiff after she engaged in protected activity supports an inference of retaliation.

The timing of the protected activity with respect to the employment consequences is not the only way Plaintiff may support her position; she may also point to "the intervening period for other evidence of retaliatory animus" to "establish causation."  *Lettieri v. Equant Inc.,* 478 F.3d 640, 650 (4th Cir. 2007).  Here, Plaintiff points to an email from Human Resources staff only days before Plaintiff was terminated expressing displeasure with Plaintiff's recent discrimination complaints partially because of the "[v]ery similar accusations [that] were raised a couple of years ago."  ECF 28, at 16, 28; ECF 29, at 339.  Drawing all inferences in favor of Plaintiff, this comment from the department that made the decision to terminate Plaintiff, in which a staff member negatively references Plaintiff's discrimination complaint just days before Plaintiff was terminated, supports an inference of retaliation.  Given both the temporal relationship between Plaintiff's protected activity and the adverse events as well as the comment made by Human Resources, Plaintiff has met her burden to show a prima facie case of retaliation.

The inquiry does not end here, however.  After a plaintiff proves a prima facie case of retaliation, "[t]he burden then shifts back to the [employer] to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason."  *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015).  As discussed above, Defendant has offered multiple

legitimate reasons behind the decision to terminate Plaintiff related to her work performance.  And though Plaintiff claims that retaliation and discrimination were the real motives behind her firing, that one Human Resources staff member sent a single email referencing a protected activity that occurred years before does not indicate that Defendant's "explanation is unworthy of credence." *Texas Dep't of Cmty. Affs. v. Burdine,* 450 U.S. 248, 256 (1981).  As such, Plaintiff is unable to show that Defendant's legitimate reasons for her termination were pretextual, and there is no genuine dispute of material fact relating to Plaintiff's retaliation claim.  Accordingly, Defendant's motion for summary judgment on count two is **GRANTED**.

### C.    Count Three: Hostile Work Environment

Plaintiff rests her hostile work environment claim Ms. Alhalaseh's conduct in 2016.  ECF 28, at 18–20.  Among the alleged comments Plaintiff highlights are Ms. Alhalaseh statements to Plaintiff's husband that Plaintiff "need[ed] to decide between her job and her health," ECF 29, at 111; her admonishment to Plaintiff of "you know, we can't look after you" after stating that Plaintiff's disability caused her to make mistakes, ECF 29, at 56; and her warning to Plaintiff that she was "not going to be able to have children" if she continued working while disabled, ECF 29, at 56.  Additionally, Plaintiff alleges that Ms. Alhalaseh pressured her to resign or "self-demote" regularly, making comments to that effect at every meeting at which the two were present.  ECF 29, at 56; ECF 28, at 19–20.  According to Plaintiff, the harassment she experienced at work from Ms. Alhalaseh worsened the symptoms of her seizure disorder.  ECF 28, at 20.

In order to succeed on a hostile work environment claim under the ADA, a plaintiff must show that "(1) [s]he is a qualified individual with a disability; (2) [s]he was subjected to unwelcome harassment; (3) the harassment was based on [her] disability; (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (5)

some factual basis exists to impute liability for the harassment to the employer." *Fox*, 247 F.3d at 177.

As noted, Defendant does not dispute that Plaintiff is a qualified individual with a disability. *See* ECF 25-2, at 16–33; ECF 33, at 5–18.[9]  That any harassment Plaintiff experienced was unwelcome is also not disputed.  The comments from Ms. Alhalaseh as reported by Plaintiff, including statements such as "[Plaintiff] needs to decide between her job and her health" and telling her to resign due to her disability, were related to Plaintiff's disability on their face, indicating that any harassment was unquestionably based on her disability.  *See* ECF 29, at 111. As to the fifth factor, Plaintiff has presented sufficient evidence to show that Ms. Alhalaseh's actions may be imputed to Defendant,[10] and Defendant has offered no argument to the contrary. *See* ECFs 25, 33 (making no suggestion that liability cannot be imputed to Defendant).  Therefore,

---

[9] Even if Defendant had argued that Plaintiff was not "qualified" for her position due to poor performance, the alleged conduct that gave rise to the hostile work environment claim occurred almost entirely in 2016.  ECF 25-3, at 27; ECF 29, at 56.  The first conduct memo Ms. Alhalaseh issued to Plaintiff was not delivered until November 30, 2016, after most of the alleged harassing conduct had already occurred.  ECF 25-3, at 42–44.  When a hostile work environment claim "rests entirely on events that occurred prior to" unsatisfactory performance, that later failure to perform does not indicate that a plaintiff was not a qualified individual at the time of the events giving rise to the hostile work environment claim.  *Jessup v. Barnes Grp., Inc.*, 23 F.4th 360, 368 (4th Cir. 2022).

[10] Ms. Alhalaseh appears to have been acting within the scope of her employment when she made the alleged harassing comments to Plaintiff, and Defendant was well aware of Plaintiff's allegations regarding Ms. Alhalaseh's conduct and found that no violation of company policy had occurred.  *See* ECF 25-3, at 27; ECF 29, at 56 (describing Ms. Alhalaseh's comments as occurring during work and relating to Ms. Alhalaseh's management of Plaintiff); ECF 29, at 98–107 (detailed contemporary accounts sent by Plaintiff to Human Resources staff); ECF 29, at 119 (notes from Human Resources staff concluding that Plaintiff had not been subject to discrimination or retaliation from Ms. Alhalaseh).  This is sufficient to enable a factfinder to find that Defendant is liable for Ms. Alhalaseh's conduct.  *See Sanders v. FMAS Corp.*, 180 F. Supp. 2d 698, 707 (D. Md. 2001) ("In the Fourth Circuit, an employer is liable for a hostile work environment created by its employees 'only if the employer knew or should have known of the illegal conduct and failed to take prompt and adequate remedial action.'" (quoting *Andrade v. Mayfair Mgmt., Inc.*, 88 F.3d 258, 261 (4th Cir.1996)).

the success of Defendant's motion for summary judgment on this claim turns on whether the alleged harassment was "severe or pervasive." *E.E.O.C. v. Rite Aid Corp.*, 750 F. Supp. 2d 564, 572 (D. Md. 2010)

The "severe or pervasive" standard is a rigorous one, and a plaintiff must show both that they subjectively experienced the conditions as abusive and that the unwelcome harassment was objectively severe or pervasive. *Id.* (citing *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008)). It cannot be disputed that Plaintiff found the alleged harassment to be *subjectively* severe or pervasive, given the extensive efforts she expended to try to remedy it, from contacting Human Resources repeatedly, to notifying the Human Rights Commission of Montgomery County, and even filing this lawsuit. ECF 29, at 160, 163, 166–69, 172–196, 218–19. The question of whether the harassment was *objectively* severe or pervasive, however, is more difficult.

In considering whether the conduct was objectively severe or pervasive, "[a] court must weigh all the circumstances of the harassing conduct, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Rite Aid Corp.*, 750 F. Supp. 2d at 572 (citing *Sunbelt Rentals, Inc.*, 521 F.3d at 315). To constitute severe or pervasive harassment, the "employment atmosphere [must be] 'permeated with discriminatory intimidation, ridicule, and insult.'" *Id.* (citing *Sunbelt Rentals, Inc.*, 521 F.3d at 315). "[C]onduct that amounts to 'simple teasing, offhand comments, and isolated incidents (unless extremely serious)'" does not rise to the level of severe or pervasive. *Id.* (citing *Sunbelt Rentals, Inc.*, 521 F.3d at 315).

In *Fox v. General Motors Corp.*, the Fourth Circuit found reasonable a jury's finding of severe or pervasive harassment when the plaintiff's supervisors "constantly berated and harassed

him and the other disabled workers" on a weekly basis; "encouraged other employees to ostracize

the disabled workers and prevent them from doing their assigned tasks by refusing to give them

necessary materials"; "requir[ed the plaintiff] to perform tasks beyond his medical restrictions";

and "exposed [the plaintiff] to some physical harm" by requiring him to perform activities that

aggravated his disabling back injury.  247 F.3d at 178–79.  Doubtless, the conditions in *Fox* were

more extreme than those allegedly present in this case; however, some of the same themes are

present here.  As Plaintiff alleges it, the comments from Ms. Alhalaseh were so frequent that she

began reporting them to Human Resources on a regular basis.  *See* ECF 29, at 97–107.  Plaintiff

documents specific comments Ms. Alhalaseh made to her and alleges that similar comments were

made by Ms. Alhalaseh at each monthly performance review, at regular staff meetings, and after

each time Plaintiff took leave for a doctor's appointment in the first half of 2016, rivaling the

weekly frequency of harassment in *Fox*.[11]  *See id.* (documenting comments from Ms. Alhalaseh in

---

[11] In contrast, Defendant cites to *McNeal v. Montgomery County*, 307 F. App'x 766, at *8 (4th Cir. 2009), a case in which the plaintiff pointed to "five accusations of theft," requirements that the plaintiff bring in documentation regarding his sick leave, and alleged racist comments which were not made to the plaintiff directly and about which the plaintiff did not have knowledge at the time they were allegedly made.  ECF 33, at 16.  The Fourth Circuit agreed with the trial judge that those facts did not constitute "severe or pervasive" harassment.  *McNeal*, 307 F. App'x at *8.  The facts of *McNeal* differ significantly from this case.  Plaintiff alleges repeated comments that occurred seemingly on a weekly basis, as opposed to five isolated comments.  *See* ECF 25-3, at 27; ECF 29, at 56; ECF 28, at 19–20.  The comments were almost all made directly to her, with the one exception being a comment made to Plaintiff's husband and presumably intended to be transmitted to Plaintiff, as it was an instruction for her (i.e., to "decide between her job and her health").  ECF 25-3, at 27; ECF 29, at 56, 111.  As such, it is clear that the alleged conduct in question in this case is more extreme than that in *McNeal*.

Defendant also cites to *Manns v. ArvinMeritor, Inc.*, 291 F. Supp. 2d 655, 661–62 (N.D. Ohio 2003) and *Henegar v. Daimler–Chrysler Corp.*, 280 F. Supp. 2d 680, 688–89 (E.D. Mich. 2003), relying on both to support an argument that an employer's request that an employee provide additional documentation in relation to their use of FMLA leave does not constitute harassment. ECF 33, at 16.  While this may be true, it does not affect this hostile work environment analysis, which centers on Ms. Alhalaseh's statements to Plaintiff regarding her disability, not her processing of Plaintiff's FMLA requests.

2016); *see also* ECF 28, at 19–20 (listing specific statements from Ms. Alhalaseh).  Moreover, Plaintiff alleges that she suffered an increase in the frequency and severity of her seizures due to the stress caused by the harassment she experienced at work.  ECF 28, at 20.  Indeed, Plaintiff was hospitalized for several months from late 2016 into early 2017.  ECF 25-3, at 13; ECF 29, at 31.

While the facts here do not provide as strong a case as those in *Fox*, they are analogous to those in *Jacob v. Didlake Corp.*, Civ. No. DKC 2006-0342, 2007 WL 178256 (D. Md. Jan. 22, 2007).  In *Jacob*, this Court denied a defendant's motion for summary judgment on a hostile work environment claim based on disability when the plaintiff's supervisor made repeated comments such as "why can't you walk faster," "hurry up," and "why are you so tired"; the plaintiff's supervisor "would get frustrated with [the plaintiff] because she was unable to complete assigned tasks due to her difficulty moving, or was required to take breaks to manage her diabetes, and [] this was humiliating to her"; and the plaintiff was "subjected to injury and risk of injury by being required to do tasks beyond her physical capability."  *Id.* at *8.  Here, Plaintiff similarly points to an ongoing onslaught of offensive comments based on her disability, obvious frustration from her supervisor regarding her disability needs, and detrimental health impacts from the conduct of her supervisor.  *See* ECF 29, at 56, 111, 172–96.  This is sufficient to establish a genuine dispute of material fact as to whether Plaintiff experienced severe or pervasive harassment based on her disability.

Defendant argues that Plaintiff's claims should be insufficient to defeat the motion for summary judgment as a matter of law because Plaintiff bases her claims only on "her own self-serving testimony."  ECF 33, at 15.  In support, Defendant cites to *Williams v. Lazer Spot, Inc.*, Civ. No. BPG-13-1850, 2014 WL 5365581, at *3 (D. Md. Oct. 21, 2014).  ECF 33, at 15.  In that case, the Court considered a failure to hire claim by the plaintiff who asserted that he had submitted

a job application, but who offered not so much as a single email to corroborate that the application was ever actually submitted. *Williams*, 2014 WL 5365581, at *3. Here, in contrast, while Plaintiff's support does largely derive from her own reported experience, she has extensive contemporaneous documentation that she submitted to outside sources regarding the events she claims occurred. *See* ECF 29, at 97–107. Additionally, unlike the plaintiff in *Williams*, Plaintiff here has been consistent in her recollection of events, further lending credence to her testimony. *Compare Williams*, 2014 WL 5365581, at *4 (explaining that the plaintiff's inconsistencies in his recollection further undercut his evidence), *with* ECF 29, at 97–107 (contemporaneous account of Plaintiff's experiences), *and* ECF 28 (arguing against Defendant's motion for summary judgment with facts largely consistent with Plaintiff's contemporaneous reports). Thus, Plaintiff does not rest her argument solely on "self-serving testimony" for this litigation, and her opposition cannot be so summarily discredited.

Making all inferences in favor of Plaintiff, she has provided sufficient evidence to establish a genuine dispute of material fact to defeat Defendant's motion for summary judgment on this count. Accordingly, Defendant's motion for summary judgment as to count three is **DENIED**.

### D.      Count Four: Failure to Accommodate

"One form of discrimination prohibited by the ADA is a failure to make a reasonable accommodation." *Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 F. App'x 314, 322 (4th Cir. 2011). "A reasonable accommodation is one that (1) 'enables [a qualified] individual with a disability . . . to perform the essential functions of [a] position,' or (2) 'enable[s] [an] employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by . . . other similarly situated employees without disabilities.'" *Hamel v. Bd. of Educ. of Harford Cnty.*, Civ.

No. JKB-16-2876, 2018 WL 1453335, at *10 (D. Md. Mar. 23, 2018) (quoting 29 C.F.R. § 1630.2(o)(1)(ii)–(iii)).

"To establish a prima facie case for failure to accommodate, the [plaintiff] must show: (1) the [plaintiff] was an individual with a disability within the meaning of the ADA; (2) the employer had notice of the disability; (3) with reasonable accommodation, the [plaintiff] could perform the essential functions of the position; and (4) the employer refused to make such accommodations." *E.E.O.C. v. Mfrs. & Traders Tr. Co.*, 429 F. Supp. 3d 89, 103 (D. Md. 2019) (citing *Rhoads v. FDIC*, 257 F.3d 373, 387 n.11 (4th Cir. 2001)).

This claim centers solely on Plaintiff's request that the music being piped into the branch in 2019 be turned off. ECF 25-2, at 23–24; ECF 28, at 18. The first three elements of Plaintiff's prima facie case are not in dispute here. As discussed above, Plaintiff has a disability within the meaning of the ADA. Defendant had notice of Plaintiff's disability as Defendant had engaged in substantial discussion with Plaintiff about it and had granted her previous accommodations. *See, e.g.*, ECF 25-5, at 5–28 (emails between Human Resources and Plaintiff regarding music accommodation). No party argues that, prior to her termination, Plaintiff would have been unable to perform the essential functions of her job even if Plaintiff was provided with her requested accommodation. Thus, the only issue is whether Defendant refused to make Plaintiff's requested accommodation.

An employee may not simply casually inform their employer about a requested accommodation and bring suit when the accommodation is not performed exactly as they requested. *Haneke v. Mid-Atl. Cap. Mgmt.*, 131 F. App'x 399, 400 (4th Cir. 2005). "Implicit in the fourth element [of the prima facie case] is the ADA requirement that the employer and employee engage in an interactive process to identify a reasonable accommodation." *Id.* (citing

29 C.F.R. § 1630.2(o)(3)).  This requirement of good faith engagement in the interactive process is not one-sided; both the employee and the employer are required to work together to come to a reasonable accommodation.  *See Fleetwood v. Harford Sys. Inc.*, 380 F. Supp. 2d 688, 701 (D. Md. 2005).  "A party that obstructs or delays the interactive process, or simply fails to communicate, is not acting in good faith to find a solution."  *Id.* (citing *Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281, 1285 (7th Cir. 1996)).

Here, the only accommodation that Plaintiff claims that Defendant denied was her 2019 request that the music being piped through the branch be turned off.  ECF 28, at 18.  Defendant asserts, and the documentary evidence supports, that Plaintiff failed to submit a request for this accommodation, despite Plaintiff's familiarity with the accommodation request process, having used it several times before.  ECF 25-2, at 13; ECF 25-5, at 37.  Instead, Plaintiff attempted to rely on a previous accommodation, which Human Resources informed her did not apply in the instant case because of the differences in the set up (i.e., company-approved music being played over a company-installed piped music system at a conversational volume as opposed to music being played by a coworker from a speaker on his desk).  ECF 25-5, at 8.  Human Resources staff told Plaintiff that she should submit a request for a new accommodation, but Plaintiff failed to do so. *Id.* at 8, 37.  As a result, it is clear that Plaintiff did not engage in the interactive process in good faith. Accordingly, Defendant's motion for summary judgment on count four is **GRANTED**.

## IV.   CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is **GRANTED** with respect Plaintiff's discrimination claim, count one; Plaintiff's retaliation claim, count two; and Plaintiff's failure to accommodate claim, count four.  Defendant's motion for summary judgment is **DENIED** with respect to Plaintiff's hostile work environment claim, count three.

A separate implementing Order follows.

Dated: <u>December 7, 2023</u>                        <u>                /s/                </u>
                                                         Brendan A. Hurson
                                                         United States District Judge